ORIGINAL

FILED
CLERK, U.S. DISTRICT COURT
AUG - 3 2007
CENTRAL DISTRICT OF CALIFORNIA
BY DEPUTY

Priority ✓
Send ✓
Enter ✓
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

ENTERED
CLERK, U.S. DISTRICT COURT
AUG - 3 2007
CENTRAL DISTRICT OF CALIFORNIA
BY DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AHAB JOSEPH ("JULIAN") NAFAL,<br>Plaintiff,<br>v.<br>SHAWN CARTER, et al.,<br>Defendants. | CV 05-2480 SVW (PJWx)<br><br>ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S CHAIN OF TITLE AND STANDING [173] |

**I. INTRODUCTION**

This copyright infringement action is brought by Plaintiff Ahab Joseph Nafal ("Plaintiff"), a resident of California, against numerous defendants ("Defendants"). Plaintiff claims ownership of an undivided one-half interest in an exclusive license to the Egyptian song "Khosara, Khosara." Plaintiff alleges that the Defendants violated his copyright interest by performing and recording commercially the song "Big Pimpin'."

197

Plaintiff's complaint, filed in this Court on April 1, 2005, alleges that Defendant Shawn Carter ("Carter"), also known as Jay-Z, and his associates, Defendants Timothy Mosely and Kyambo Joshua, recorded a musical work known as "Big Pimpin'" that infringed on Plaintiff's license. Plaintiff had acquired an undivided one-half interest in an exclusive worldwide license (excluding Egypt) for "Khosara, Khosara" under a written assignment dated January 27, 2005. A melody used in "Big Pimpin'" was allegedly sampled from "Khosara, Khosara" without Plaintiff's permission.

"Big Pimpin'" was first released in 1999, in a CD entitled Jay-Z Vol. 3: Life and Times of S. Carter ("Life and Times"). The accused track was performed by Carter and members of the band Underground Kingz, consisting of Defendants Chad Butler and Bernard Freeman. Later, Carter performed the infringing work live in collaboration with the band Linkin Park - which consists of Defendants Rob Bourdon, Brad Delson, Mike Shinoda, Dave Farrell, Joseph Hahn, and Chester Bennington - at a series of concerts known as Collision Course. Recordings of the concerts were released on CD and DVD in November 2004.[1]

The Complaint also names as Defendants corporate entities that were allegedly responsible for the infringing works: Roc-A-Fella Records LLC, Timbaland Productions, Inc. ("Timbaland"), Def Jam Recordings Inc., Warner Music Group Inc., MTV Networks Enterprises Inc., Machine Shop Recordings LLC, Universal Music Group Inc., Lil Lulu Publishing, EMI Music Inc., EMI Music Publishing Ltd., EMI Music

---

[1] The version of "Big Pimpin" released on the Collision Course recordings was titled "Big Pimpin/Papercut." The Court will refer to all versions of the infringing work as "Big Pimpin'."

Arabia Inc., EMI Blackwood Music Inc., Virginia Beach Music, Chesterchaz Publishing, Rob Bourdon Music, Nondisclosure Agreement Music, Big Bad Mr. Hahn Music, and Kenji Kobayashi Music.

Plaintiff's complaint alleges nine causes of action: 1) copyright infringement (composition) relating to Collision Course; 2) copyright infringement (sound recording) relating to Collision Course; 3) false designation of origin in violation of the Lanham Act, 15 U.S.C. § 1125(a), relating to Collision Course; 4) copyright infringement (composition) relating to Life and Times; 5) copyright infringement (sound recording) relating to Life and Times; 6) false designation of origin in violation of the Lanham Act, 15 U.S.C. § 1125(a), relating to Life and Times; 7) false promotion and representations in violation of the Lanham Act, 15 U.S.C. § 1125(a); 8) slander of title against the EMI entities; and 9) unfair business practices under Cal. Bus. & Prof. Code § 17200 and the common law. On August 16, 2006, defendant EMI Music Arabia, Inc., was dismissed for lack of personal jurisdiction. [Docket No. 153.]

The Court has divided this case into three phases: (1) standing; (2) liability; and (3) damages. Because of the substantial litigation related to EMI Music Arabia's personal jurisdiction motion, which was resolved in August 2006, the case is still in Phase I. The Defendants (outside of the now-dismissed EMI Music Arabia) have collectively filed the instant motion for summary judgment on "chain of title and standing." In the alternative, Defendants request that the lawsuit be dismissed for Plaintiff's failure to join indispensable parties. The parties have now fully briefed the Court.

For the reasons discussed below, this Court GRANTS Defendants' motion for summary judgment on Plaintiff's chain of title and standing.

## II. BACKGROUND

### A. Scope of this Motion

As a procedural point, it must be emphasized that Phase I is strictly limited to whether Plaintiff has standing to maintain this lawsuit. The Court made this point very clear some time ago. "The relevant issues are Plaintiff's standing and the existence of any licensing agreements. Whether Defendants are liable is not at issue in Phase I. . . . If Plaintiff prevails in Phase I and establishes that he has standing to assert an infringement claim, then the issue of Defendants' liability will be tried in the next phase of the proceeding." [Docket No. 98 at 2.]

However, Defendants' counsel has gone beyond the scope of what may be litigated in Phase I. Plaintiff's standing in a musical composition and/or a sound recording is based entirely on whether he has been assigned an interest that would allow him to litigate this lawsuit. While Defendants focus the majority of their briefing on the purported agreements between Plaintiff and those who allegedly own the interests to the "Khosara, Khosara" song, they have reached further. Specifically, Defendants argue that Plaintiff lacks "standing" in the "Khosara, Khosara" sound recording because the recording utilized by Defendants is not the same as the one in which Plaintiff claims to have a cognizable interest.

Defendants may be correct that there are two completely different sound recordings, and that the one they have sampled in Big Pimpin' is

not the one in which Plaintiff claims any rights. Yet, this is plainly a non-infringement argument that this Court has reserved for the Phase II liability proceedings.

Not surprisingly, Defendants' case law authority in support of this stratagem is unavailing. Defendants cite to Griffin v. J-Records, 398 F. Supp. 2d 1137 (E.D. Wash. 2005), but this case never once uses the word "standing." Griffin only briefly discussed whether there was "infringement" of a sound recording, not whether the plaintiff had standing to file suit. See id. at 1142-43. Defendants' citation to Marder v. Lopez, 450 F.3d 445, 453 (9th Cir. 2006), is also unpersuasive. In a parenthetical to this case, Defendants write "plaintiff must show ownership of the allegedly infringing material." (Defs. Reply at 12 (emphasis added).) However, the actual language from the opinion states that a plaintiff "must show ownership of the allegedly infringed material." Marder, 450 F.3d at 453.

Plaintiff has alleged an exclusive interest in a particular sound recording owned by the Hamdy heirs (the allegedly "**infringed** material"), not in some separate sound recording that Defendants claim to have actually used ("the allegedly "**infringing** material"). The standing inquiry is limited to determining whether the copyright owners have conferred upon Plaintiff a sufficient ownership interest in the "infringed" sound recording. If Plaintiff establishes standing in that sound recording based upon the agreements he entered into with others, then Defendants can argue in Phase II that this recording was not infringed because they sampled a completely different sound recording. Therefore, the Court will not analyze any facts pertinent to whether Defendants' "Khosara, Khosara" sound recording differs from Plaintiff's.

Relatedly, Defendants also describe numerous facts that would appear to demonstrate that they have a valid license to use the "Khosara, Khosara" musical composition. (Defs. Brief at 2-3.) However, Defendants recognize that this defense goes to the case's "merits," which is a Phase II matter. (Id. at 1 n.2; see also id. at 11 n.8.) The Court will similarly avoid any references to such facts. Instead, the Court will focus on the chain of title from Hamdy to Plaintiff, and the rights that he purportedly obtained.

B. Facts

In approximately 1957, Balight Hamdy, an Egyptian composed and co-authored the musical composition Khosara, Khosara. (Defs'. State. Uncontr. Facts No. 1.)[2] Hamdy wrote the music, while a third-party authored the lyrics. (Id.) In 1960, the song was recorded by Egyptian vocalist Abdul Halm Hafez for use in the Egyptian film "Fata Ahlami." (Id. No. 9.)[3]

Hamdy died in 1993. (Lewis Decl. Ex. 1 at 5.) His heirs were sisters Asmaa Abdel Hamid Hamdy ("Asmaa") and Safia Abdel Hamid Hamdy ("Safia"), as well as brother Morsy Saad El-Din Abdel Hamid Hamdy ("Morsy"). (Id.) Under the inheritance laws, Morsy received a 50% ownership interest in Khosara, Khosara, while Asmaa and Safia each had a 25% interest. (Id. Ex. 2 at 26.) When Safia died on either October 26, 1993 or December 12, 1993, Morsy came to own 2/3 of the song,

---

[2] Defendants cite to Plaintiff's complaint for this, and other propositions, in the forthcoming description of the evidentiary record. Since Defendants stipulate to the accuracy of certain allegations for purposes of this motion, the Court can accept these claims for their evidentiary value, if any.

[3] Defendants claim to have a valid license to the Khosara, Khosara musical composition and argue that the sound recording they used in creating Big Pimpin is different from the one created for Fata Ahlami. As already discussed, such facts are irrelevant to Plaintiff's chain of title.

while Asmaa owned 1/3. (Id.; Besser Decl. Ex. B) Asmaa died in December 2002, and her 1/3 interest was passed on to her four children in varying degrees, including her son Ossama. (Lewis Decl. Ex. 2 at 26; Besser Decl. Ex. A.) Based on the evidence before this Court, Ossama has the general power of attorney to act on behalf of all living Hamdy heirs. (Lewis Decl. Ex. 3 at 40-46; Besser Decl. Ex. C.)

At some point, Amira Farouk Fathallah ("Amira") told her father, Farouk Fathalla Sima, that she heard Khosara, Khosara being used in Big Pimpin'. (Lewis Decl. Ex. 6 at 42-43.) Sima and Plaintiff became acquaintances through a real estate transaction at around this time. (Id. at 37.) Sima and Plaintiff were both interested in the music business, and Sima suggested that Plaintiff look into the possibility of filing a lawsuit. (Id. at 48-49.) Prior to 2000, Sima had never performed any work in the music industry, and was merely a "fan." (Id. at 48.)

On January 27, 2001, the Hamdy heirs (through Ossama) entered into an "Agency Contract and Agreement"[4] with Sima. (Id. Ex. 9.) The agreement begins with a preamble in which the parties note that Sima had reported the alleged infringement of Khosara, Khosara to the Hamdy heirs. Additionally,

> [Sima] contacted prominent lawyers specialized in intellectual property and protection of composers' rights cases, and consulted them over infringement of the [Hamdy heirs'] rights by using the musical composition of the above mentioned song and they confirmed that such infringement exists and proved to be true,

---

[4] Many of the key documents pertaining to this motion appear to be translations of documents that were drafted in Arabic. Since neither side has objected to the translations submitted to this Court, such objections are deemed waived with regard to the instant motion.

> and is established [sic] that success is guaranteed for the compensation claims for such infringement as long as such lawsuits are filed within the scope of the law and the right legal procedures against the person who stole the music subject to infringement.

(Id. at 142) In Article 2, the Hamdy heirs are recognized as "the actual and sole owner for public performance of the music and musical parts of the song 'Khosara, khosara.'" (Id. at 143.) In contrast, Sima would file a lawsuit on behalf of the Hamdy heirs. (Id.) The Hamdy heirs were not financially responsible for any funds expended during the pendency of the lawsuit, and would receive 60% of any recovery, minus attorneys' fees, at the dispute's conclusion. (Id. at 143-44.)

Ossama and Sima also entered into a "License Agreement." (Id. Ex. 1 at 15-18.) This document refers to Ossama as the "Copyright Holder," even though at that time he was only acting as the agent for the Hamdy heirs.[5] The agreement states that "[t]he license granted by this agreement is an exclusive license to use the products which incorporate any of the intellectual property included within the Copyrights. This exclusive license extends throughout the entirety of the Territory described below." (Id. at 15.) The License Agreement extended to all countries other than Egypt, and was set to expire on December 31, 2002 (although it included an automatic annual one-year renewal clause absent a notice of termination by a certain prescribed

[5] This error was corrected by an addendum to the License Agreement that was signed by Sima and Ossama on March 7, 2005, which recognized that Ossama was acting as the Hamdy heirs' agent in the 2001 License Agreement. (Id. Ex. 1 at 14.) This document was also signed by Ossama and Sima.

date). (Id. at 16.) Consistent with the Agency Contract and Agreement, the License Agreement entitled the "Copyright Holder" to 60% of all income (after costs). (Id.) The License Agreement also had an express clause relating to infringement:

> In the event Licensee becomes aware of any infringement of the Copyrights within the Territory, whether during the term of this agreement or prior to this agreement, Licensee may prosecute all parties believed to be responsible for the infringement including the right to sue for infringement in Licensee's own name and the right to negotiate any settlement of any such infringement. All amounts recovered pursuant to any such claims of infringement shall be subject to the payment of the Royalty as described above. Copyright Holder shall provide whatever assistance may be required by Licensee to prosecute any such claim of infringement.

(Id. at 17.) Before signing this document, Ossama had been made aware by Sima that there was a possible infringement of the Khosara, Khosara copyright in the United States. (Id. Ex. 6 at 75:13-22.)

Plaintiff finally enters the picture on February 21, 2001. On this date he entered into a "Joint Venture Agreement" with Sima. (Id. Ex. 7 at 136.) The Joint Venture Agreement asserts that Sima is the "licensee of certain copyrights" and that Plaintiff "desires to assist" Sima in commercial ventures and/or lawsuits pertaining to the copyrights. (Id.) Plaintiff agreed to assist Sima in finding a lawyer "who will agree to take all [sic] the case on contingency." (Id.) Sima and Nafal further agreed to equally split the remaining share of any award that remained after the Hamdy heirs were paid their 60% share. (Id.) This agreement did not in any way appear to convey any copyright interests allegedly owned by Sima to Plaintiff.

Nearly four years passed until the "Assignment Agreement" was executed on January 27, 2005. (Id. Ex. 1 at 7.) This agreement is ostensibly, and only between, Sima and Plaintiff. (Id. ("This Assignment Agreement . . . is entered . . . between . . . [Sima] and . . . [Plaintiff]."). ) However, Ossama also signed the document in order to give the "copyright holder['s]" consent to the Assignment Agreement. (Id. at 12.)

In the Assignment Agreement, the parties claim that Sima has the exclusive license to certain rights in the song Khosara, Khosara (outside of Egypt). (Id. at 7.) By this document, Sima:

> [A]ssigns, transfers and conveys to [Plaintiff] an undivided one-half (50%) of his rights, title and interest that he holds in the License Agreement. Upon execution of this Agreement, and subject to the express limitations provided for herein, [Sima] and [Plaintiff] shall become equal co-holders in the licensing rights to [Khosara, Khosara] within all places on Earth with the exception of Egypt (the rights within Egypt to be retained and held solely by [Sima]).

(Id.) Furthermore, the Assignment Agreement also provides that:

> [Sima] hereby grants to [Plaintiff] the sole and exclusive power, authority and capacity to negotiate, enter into and sign licenses and contracts with third parties for the purpose of exercising the rights under the License Agreement and otherwise exploiting [Khosara, Khosara] pursuant to the License Agreement within all territories outside of Egypt. However, no such contract (with the exception of contracts relating to enforcement of the copyright holdings against a suspected infringement, the approval of which shall be governed by Paragraph 5 below) shall be entered

without the advance approval of [Sima], other than standard industry agreements (e.g., mechanical license agreements, etc.). (Id. at 8.) The Assignment Agreement largely focuses on how Sima and Plaintiff intend to proceed with litigating this action, and how expenses and/or monetary rewards will be divided. The Assignment Agreement further states that "no . . . [legal] professional shall be retained, and no lawsuit or other formal legal proceeding shall be commenced, without the advance approval of [Sima]." (Id. at 10.) The Assignment Agreement ends by stating, though, that Plaintiff has the right to pursue an infringement claim against the owners of Big Pimpin' with a specified attorney, and that Sima had the right to terminate the contract if such a lawsuit had not been filed with 180 days. (Id. at 11-12.)

At about this time, Sima and Ossama also agreed to amend their License Agreement to: (1) extend its original lifespan through December 31, 2007; (2) change the renewal clause from one year to a period of five year; (3) reduce the Hamdy heirs' rights to recover any fee obtained in this litigation from 60% to 50%, after expenses; and (4) allow Sima to prosecute an action in his name, or with someone else, or by an individual authorized by him to file such a lawsuit. (Id. at 13.)[6]

///

///

///

[6] Defendants have also objected to Plaintiff's declaration on various grounds. The Court need not resolve these objections because Plaintiff's declaration largely focuses on his subjective motivations and how he came to be involved in this litigation. Such facts are not material to this motion's resolution.

**III. DISCUSSION**

A. Legal Standard Governing Summary Judgment

Rule 56(c) requires the Court to grant summary judgment for the moving party when the evidence, viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Tarin v. County of Los Angeles, 123 F.3d 1259, 1263 (9th Cir. 1997).

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. See Celotex Corp v. Catrett, 477 U.S. 317, 323-24 (1986). That burden may be met by "'showing' - that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case." Id. at 325. Once the moving party has met its initial burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and identify specific facts that show a genuine issue for trial. See id. at 323-24; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1968). "A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact." Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).

Only genuine disputes - where the evidence is such that a reasonable jury could return a verdict for the nonmoving party - over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. See Anderson, 477 U.S. at 248; see also Arpin v. Santa Clara Valley Transp. Agency, 261 F.3d 912, 919 (9th Cir. 2001) (holding the

nonmoving party must provide specific evidence from which a reasonable jury could return a verdict in its favor).

Where the moving party bears the burden of proof, he/she must present evidence which, if uncontroverted, would entitle it to prevail. UA Local 343 v. Nor-Cal Plumbing, Inc., 48 F.3d 1465, 1471 (9th Cir. 1994). Once such a moving party has established a prima facie case, the non-moving party must produce evidence to contradict it in order to survive summary judgment. When a plaintiff's standing is at issue, the plaintiff has the burden of establishing his/her right to sue with uncontroverted facts. See Barnes-Wallace v. City of San Diego, 471 F.3d 1038, 1044 (9th Cir. 2006).

B. Exclusive Licensees Under the 1909 or 1976 Copyright Acts

The parties dispute whether Plaintiff's standing to sue must be adjudicated under the 1909 or 1976 Copyright Acts.[7] While Khosara, Khosara was created prior to the 1976 Copyright Act's effective date, Plaintiff's "interest" was assigned to him and the causes of action at stake in this case accrued afterward. Plaintiff does not contend that he has been assigned the entire Khosara, Khosara copyright(s), but that he owns a portion of an exclusive license[8] to the song.

///

///

[7] In Silvers v. Sony Pictures Entertainment, Inc., 402 F.3d 881 (9th Cir. 2005) (en banc), the Ninth Circuit recently held that, under the 1976 Copyright Act, "[t]he bare assignment of an accrued cause of action" was insufficient by itself to confer standing upon a plaintiff.

[8] There is no question that a non-exclusive license in Khosara, Khosara would be insufficient to confer standing on Plaintiff. See, e.g., I.A.E., Inc. v. Shaver, 74 F.3d 768, 775 (7th Cir. 1996) ("[A] person holding a nonexclusive license has no standing to sue for copyright infringement."); see also 1 Melville B. Nimmer & David Nimmer, Nimmer on Copyright, § 12.02[B] ("[A] nonexclusive licensee has no more standing to sue than was the case under the 1909 Act.").

1. The 1909 Act

Under the 1909 Act, one's standing to sue traditionally depended upon whether a particular agreement amounted to an "assignment" or to a mere "license" (exclusive or non-exclusive). This distinction was detailed by the Ninth Circuit relatively recently:

> Under the Copyright Act of 1909 ("1909 Act"), copyright licenses (whether exclusive or not) were "not transferable as a matter of law." Harris v. Emus Records Corp., 734 F.2d 1329, 1333 (9th Cir.1984). Unlike an assignee, a licensee "had no right to resell or sublicense the rights acquired unless he had been expressly authorized so to do." 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 10.01[C][4] (2001). The distinction between licenses and assignments was based on both the doctrine of indivisibility and the policy concerns underlying the 1909 Act.
>
> Under the doctrine of indivisibility, a copyright owner possessed an indivisible "bundle of rights," which were "incapable of assignment in parts." Id. § 10.01[A]. Thus, an assignment included "the totality of rights commanded by copyright." Id. Anything less than an assignment was considered a license. Id. The purpose of the doctrine was "to protect alleged infringers from the harassment of successive law suits. This result was achieved because only the copyright proprietor (which would include an assignee but not a licensee) had standing to bring an infringement action." Id. As discussed in Nimmer on Copyright and reiterated by the District Court, the doctrine of indivisibility created many problems for copyright licensees,

> including the licensee's lack of standing to bring an infringement action and the exclusive licensee's inability to register his license. Id. § 10.01[C]; see Gardner, 110 F. Supp. 2d at 1285.

Gardner v. Nike, Inc., 279 F.3d 774, 777-78 (9th Cir. 2002). But "[i]n fact, if not in theory, the 1909 Act's rule of indivisibility had begun to erode well before the 1976 Act largely obliterated it. Under the 1909 Act, courts allowed exclusive licensees to sue for infringement if they joined the copyright owner as a party plaintiff or defendant in the action." 1 Paul Goldstein, Goldstein on Copyright, § 5.1.1.2, at 5:10 (3d ed. 2005).

The Ninth Circuit has adopted this more-flexible approach to the 1909 Act's indivisibility principle. Thus, even if Plaintiff only owned a portion of an exclusive license to Khosara, Khosara, this fact would not necessarily be fatal to his claims. In Cable Vision, Inc. v. KUTV, Inc., 335 F.2d 348 (9th Cir. 1964), the Ninth Circuit considered how an exclusive licensee would be able to "redeem his interest in an infringement action . . . ." Id. at 354. While the Court recognized that "an exclusive licensee may not alone maintain an infringement action, he may do so, however, if he joins the copyright owner and may even join the owner as an involuntary party." Id. at 353-54 (citations omitted). Under the 1909 Act, an exclusive licensee could still litigate his/her lawsuit once the copyright owner (and any other "co-exclusive licensees") were joined.

2. The 1976 Act

The indivisibility principle was generally abolished by the 1976 Copyright Act. 17 U.S.C. § 201(d) permits a copyright owner to convey separately the exclusive rights created by 17 U.S.C. § 106 (right to

reproduce, right to distribute, right to prepare derivative works, etc.). 17 U.S.C. § 501(b) also provides that "[t]he legal or beneficial owner of an exclusive right under a copyright is entitled . . . to institute an action for any infringement of that particular right committed while he or she is the owner of it." An exclusive license must be transferred in writing to the licensee. See 17 U.S.C. § 204(a). As recognized by the Ninth Circuit in Gardner, "an exclusive licensee now has the right to sue for infringement of the assigned right in his own name." 279 F.3d at 779.

In contrast to the 1909 Act's provisions, the 1976 Act allows an exclusive licensee to proceed with a copyright infringement lawsuit even in the licensor's absence. See Nimmer & Nimmer, supra, § 12.02[B] ("It is no longer necessary for an exclusive licensee to join his licensor as a party to the action. As the owner of 'an exclusive right under a copyright,' an exclusive licensee is 'entitled . . . to institute an action for any infringement of that particular right committed while he or she is the owner of it.'") (footnotes and citations omitted). This result makes sense because "[o]nce the copyright owner grants an exclusive license of particular rights, only the exclusive licensee and not the original owner can sue for later infringements of such rights." Althin CD Med., Inc. v. W. Suburban Kidney Ctr., S.C., 874 F. Supp. 837, 842 (N.D. Ill. 1994).

3. Which Act Applies to Plaintiff's Standing Analysis?

Not surprisingly, Plaintiff claims that he is governed by the 1976 Act's more lenient analysis for exclusive licensees, while Defendants argue that the 1909 Act aplies. Though Khosara, Khosara was created prior to the 1976 Act's effective date, the alleged infringement by Defendants and the transfers leading to Plaintiff's

asserted interest in an exclusive license all took place after January 1, 1978.[9] Some courts appear to be split on this question, although Nimmer believes that the answer is plain: "[a]ny rights or remedies under the 1909 Copyright Act are superseded by the rights and remedies under the current Copyright Act with respect to causes of action arising on or after January 1, 1978. This is true even as regards to works that first became the subject of copyright before 1978 under the 1909 Act." 1 Nimmer & Nimmer, supra, § 1.01[D]. The Second Circuit has also similarly stated that:

> Whoever holds an interest in a copyright on or after January 1, 1978, has a right to the protections afforded by the new statute, although the creative work may previously have been governed by the 1909 Act or the common law. [The 1976 Act] does not, however, purport to determine who holds a copyright for works created before January 1978. It merely clarifies the rights of individuals owning copyrights on that date, whomever they may be.

Roth v. Pritikin, 710 F.2d 934, 938 (2d Cir. 1983). Based on the above-quoted sections of Nimmer and Roth, a district court in the Southern District of New York held in Essex Music, Inc. v. ABKCO Music & Records, Inc., 743 F. Supp. 237, 240-41 (S.D.N.Y. 1990), that the 1976 Act applied to an exclusive licensee's right to sue even though the copyright was created while the 1909 Act was in effect. Cf. 1 Nimmer, supra, § 12.02[C] at n.35 ("To the extent that a beneficial owner's standing to sue differs between the 1909 Act and the current Act, the latter applies to causes of action arising after January 1,

[9] Although passed in 1976, the 1976 Act did not go into effect until January 1, 1978. See Twentieth Century Fox Film Corp. v. Entertainment Distributing, 429 F.3d 869, 876 (9th Cir. 2005).

1978, even if the instrument creating such beneficial interest was executed pre-1978.").

Together, Nimmer, Roth, and Essex suggest that while ownership of a copyright is determined by the copyright act in effect at the time of its creation, the rights and remedies available to the owner and/or exclusive licensee of that copyright are now solely determined with reference to the 1976 Act. However, the Ninth Circuit does not appear to follow this rule. In a footnote, Nimmer opines that "[s]ome cases have erroneously assumed that rights and remedies under the 1909 Act were applicable to works first obtaining statutory copyright pre-1978, where the causes of action in issue arose after January 1, 1978." 1 Nimmer & Nimmer, supra, § 1.01[D] n.309. As noted by Nimmer, one such "erroneous" case is from the Ninth Circuit.

In Lone Ranger Television, Inc. v. Program Radio Corp., 740 F.2d 718 (9th Cir. 1984), the Ninth Circuit heard a case in which the copyrights to certain scripts were created prior to the 1976 Copyright Act, but the infringement did not occur until the new act was effective. Id. at 720. In affirming the district court, the Ninth Circuit resolved the merits based solely on a consideration of the rights afforded by the 1909 Act. See id. at 722 ("[T]he 1909 Act does confer a right with which [defendant's] unlicensed tapes of the scripts conflict."). Additionally, at least three other Ninth Circuit cases since Lone Ranger have broadly held that the 1909 Act is the "applicable law" for any copyrights created prior to the 1976 Act's effective date. See Twentieth Century Fox Film Corp v. Entertainment Distributing, 429 F.3d 869, 876 (9th Cir. 2005) ("We first consider [plaintiff's] infringement claims under the now repealed Copyright Act of 1909 because Crusade in Europe was published before the January 1,

1978, effective date of the 1976 Copyright Act . . . ." Dolman v. Agee, 157 F.3d 708, 712 n.1 (9th Cir. 1998) ("The 1909 Act is the applicable law in cases in which creation and publication of a work occurred before January 1, 1978, the effective date of the 1976 Act."); Magnuson v. Video Yesteryear, 85 F.3d 1424, 1427 (9th Cir. 1996) ("The district court correctly held that the Copyright Act of 1909 is the applicable law in this case because the copyright was secured in 1968, prior to the adoption of the 1976 Act."). Neither Dolman nor Magnuson even hint that the 1909 Act's application might be limited to the copyright's existence, but that the 1976 Act would govern the rights and remedies afforded by that act (as claimed by the Second Circuit in Roth).

Regardless of whether or not this Court finds Roth, Essex, and Nimmer to be persuasive, this Court is bound to follow Ninth Circuit precedent. Based on the Lone Ranger case, it is clear that the rights afforded to copyrights created and published before 1978 are governed solely by the 1909 Act. Such copyrights were not automatically vested with the exclusive rights that were created as a consequence of the 1976 Act.

Since Plaintiff's rights are confined to those permitted by the 1909 Act, the same must also be true as to his remedies (e.g., his standing to file suit). As stated by the Ninth Circuit in Gardner, "[t]he plain language of § 201(d)(2) limits the rights of an exclusive licensee to those 'protections and remedies' afforded in the 1976 Act." 279 F.3d at 780. Because Khosara, Khosara is not governed by the 1976 Act, including the right to engage in piecemeal transfers of exclusive rights pursuant to Section 201(d)(2), Section 501(b) cannot be invoked by Plaintiff as a mechanism for filing this lawsuit.

Thus, even if Plaintiff is designated as a co-owner of an exclusive license, he could not proceed with the lawsuit without joining the Hamdy heirs (the copyright owners) and Sima (the other co-owner of the "exclusive license").

C. Co-Ownership of an "Exclusive License"

Plaintiff claims that he and Sima each own an undivided one-half interest in an exclusive worldwide license (excluding Egypt) for the song Khosara, Khosara. Defendants reject the argument that Plaintiff and Sima can possibly be "co-exclusive licensees," asserting that the "term itself is an oxymoron. If there is more than one licensee of a particular exclusive right or series of exclusive rights, they no longer are exclusive." (Defs. Brief at 14.) The Court disagrees with this reasoning.

Both the 1909 and 1976 Acts allow multiple individuals to be joint owners (or co-owners) of the same copyright. See House Report No. 94-1476 (1976) ("Under the bill, as under the present law, coowners of a copyright would be treated generally as tenants in common, with each coowner having an independent right to use or license the use of a work. . . ."). Defendants fail to explain why the rights attendant to an entire copyright should be (and are) considered "exclusive" despite the presence of multiple co-owners, while the same should be labeled an "oxymoron" where two individuals hold joint rights to an exclusive license. A co-exclusive licensee is no different from a co-owner of a copyright, other than the fact that the former owns some lesser portion of the bundle of rights retained by the latter. As stated by another district court, "[t]o find that a licensee of an exclusive license lacks copyright standing because the copyright owner also granted the exclusive license to one or more

other licensees would, indeed, fly in the face of case law affirming the Copyright Act's recognition of joint ownership of exclusive rights." Chirco v. Gateway Oaks, LLC, 2005 WL 2284218, at *6 (E.D. Mich. Aug. 26, 2005).

Outside of two citations to dictionaries, and a narrow reading of the Copyright Act that excludes the recognition of copyright co-owners in Section 201(a), Defendants' argument against "co-exclusive licensees" rests solely upon the Seventh Circuit's Shaver decision.

In Shaver, the Seventh Circuit explained that "[i]n an exclusive license, the copyright holder permits the licensee to use the protected material for a specific use and further promises that the same permission will not be given to others." 74 F.3d at 775. However, this statement does not mean that only one entity or person can be imbued with an exclusive license to a single right (or set of rights) conferred by the 1909 or 1976 Acts.

Rather, a license is nonexclusive because "[t]he copyright owner simply permits the use of a copyrighted work in a particular manner." Id. When the owner conveys a nonexclusive license to one person, the owner still has the power to do precisely the same thing for everyone else in the world. A license is exclusive not simply when one individual or entity is given the right to use a copyright, but only because the owner promises not to convey that right to anyone outside of those persons or entities who have an interest in the license. It is this promise that differentiates an exclusive license from a nonlicense, not the quantity of persons and entities who have an interest in the license.

///

///

D. Whether Plaintiff is in Fact a "Co-Exclusive Licensee"

Before examining the alleged "interest" owned by Plaintiff, it is necessary to summarize a recent Ninth Circuit decision on the law of standing in the copyright context. In Silvers v. Sony Pictures Entertainment, Inc., 402 F.3d 881 (9th Cir. 2005) (en banc), the plaintiff had written the script for "The Other Woman," which was a work-for-hire made for Frank & Bob Films II. Id. at 883. Although Frank & Bob Films II retained ownership in the film, the company assigned to plaintiff "all right, title and interest in and to any claims and causes of action against Sony Pictures Entertainment, Inc., Columbia TriStar, and any other appropriate persons or entities, with respect to the screenplay 'The Other Woman' . . . and the motion picture 'Stepmom.'" Id.

Under 17 U.S.C. § 501(b), "[t]he legal or beneficial owner of an exclusive right under a copyright is entitled . . . to institute an action for any infringement of that particular right committed while he or she is the owner of it." Thus, in Silvers, "[t]he statute does not say expressly that only a legal or beneficial owner of an exclusive right is entitled to sue. But, under traditional principles of statutory interpretation, Congress' explicit listing of who may sue for copyright infringement should be understood as an exclusion of others from suing for infringement." 402 F.3d at 885. The Ninth Circuit also examined the 1976 Copyright Act's legislative history, and noted that "Congress intended to 'unbundle' the exclusive rights" by allowing an owner of any particular exclusive right to file suit. Id. at 886. The Ninth Circuit reasoned, however, that "[a]lthough Congress allowed for divisibility of ownership interests under a

copyright, it did not alter the requirement that only owners of an exclusive right in the copyright could bring suit." Id.

The Ninth Circuit concluded that "[t]he bare assignment of an accrued cause of action is impermissible under 17 U.S.C. § 501(b)." Id. at 890. The question to be answered, therefore, is whether Plaintiff has in effect been assigned the bare right to file a lawsuit against the Defendants, or whether this lawsuit is being filed in furtherance of some exclusive right that he owns.[10]

"Unfortunately, nothing in the Copyright Act tells judges how to distinguish among assignments, exclusive licenses, and nonexclusive licenses." Roger D. Blair & Thomas F. Cotter, The Elusive Logic of Standing Doctrine in Intellectual Property Law, 74 Tul. L. Rev. 1323, 1370 (2000). Additionally, neither side has helped the Court in this case by delineating whether exclusive licenses should be evaluated under the auspices of federal or state law (or some combination thereof). See S.O.S., Inc. v. Payday, Inc., 886 F.2d 1081, 1088 (9th Cir.1989) ("We rely on state law to provide the canons of contractual construction, but only to the extent such rules do not interfere with federal copyright law or policy."). "[W]here the Copyright Act does not address an issue, we turn to state law to resolve the matter, so long as state law does not otherwise conflict with the Copyright Act." Foad Consulting Group, Inc. v. Azzalino, 270 F.3d 821, 827 (9th Cir. 2001). From this vantage point, the Foad Court concluded that nonexclusive licenses are to be analyzed under state law. Id. But as to exclusive licenses, the Ninth Circuit has held that federal law

---

[10] Although Silvers was based on the 1976 Act, there is no reason to doubt that its prohibition against a lawsuit would also apply to the 1909 Act. This is especially true considering the fact that the 1909 Act had a more restrictive standing analysis than the 1976 Act.

requires the copyright owner to consent to an exclusive licensee's right to another. Gardner, 279 F.3d at 781 n.5.[11] Yet, Gardner does not necessarily stand for the proposition that every aspect of an exclusive license must governed by federal law.[12]

At the least, the Court must examine the interstices of the various agreements, and consider their combined effect. It is important to recall that Plaintiff was not even a party to the first two agreements, which involved the Hamdy heirs and Sima. Plaintiff's argument is that Sima obtained an exclusive license to exploit all copyrights in the song Khosara, Khosara, through the License Agreement. Defendants raise two counterarguments to this assertion: (1) the accompanying and simultaneously signed Agency Contract and Agreement refers to the Hamdy heirs as the "actual and sole owner for public performance of the music and musical parts of the song"; and (2) the License Agreement does not actually convey an interest in the song.

Defendants' first contention is unpersuasive. It may be true that the Agency Contract and Agreement demonstrates that the Hamdy heirs never relinquished any rights to Khosara, Khosara's public performance. However, this language fails to establish by itself that the Hamdy heirs did not convey other exclusive rights in Khosara, Khosara to Sima via the License Agreement (e.g., reproduction, derivative works).

---

[11] Since the Hamdy heirs (through Ossama) consented to Plaintiff's co-ownership of Sima's exclusive license, Gardner is not an obstacle to Plaintiff in this litigation. Additionally, Section 204(a) requires that an exclusive license be in writing, see 17 U.S.C. § 204(a), which occurred in this case.

[12] Courts have often been cryptic in their efforts to intuit a sensible construction of a purported exclusive license. See, e.g., McCormick v. Amir Constr. Inc., 2006 WL 784770 (C.D. Cal. Jan. 12, 2006).

Defendants' second claim requires more careful consideration. The License Agreement states that "[t]he license granted by this agreement is an exclusive license to use the products which incorporate any of the intellectual property included within the Copyrights," in any place but Egypt. Defendants argue that the phrase "use the products" indicates an intent only to allow Sima to use (and presumably sell) the physical manifestations of Khosara, Khosara's intellectual property (e.g., CDs), but did not convey any rights in the intellectual property itself. While the contractual language is sloppy, and perhaps the result of a poor translation, the Court must read the License Agreement in its entirety. In particular, the Court cannot ignore the "recitals" section of the License Agreement, in which the Hamdy heirs specify their "desire[] to license certain rights in the Copyrights to [Sima]" through this written instrument. Although inartful, the Court concludes that the operative language of the License Agreement was aimed at conveying the Hamdy heirs' interests in the copyrights of Khosara, Khosara, not the mere products in which Khosara, Khosara may physically appear. Thus, the Court would tentatively conclude that Sima obtained an exclusive license in Khosara, Khosara.

But it is not enough to conclude that Sima acquired an exclusive license to the song. Plaintiff must himself be a co-exclusive licensee in order to proceed with the lawsuit. Plaintiff is a party to two agreements: (1) The Joint Venture Agreement; and (2) the Assignment Agreement. The Joint Venture Agreement certainly does not assist Plaintiff, which was between himself and Sima. This document, signed a month after the License Agreement and the Agency Contract and Agreement, only discusses Plaintiff's desire to "assist" Sima. The

Joint Venture Agreement centers on Plaintiff's responsibility of finding a lawyer who will "take all [sic] the case on contingency," and the division of monetary expenses and potential litigation awards. It is not until 2005, when the Assignment Agreement was executed, that Plaintiff could plausibly allege that he had an ownership interest in Khosara, Khosara. This document states that Plaintiff has "an undivided one-half (50%) of [Sima's] rights, title and interest that he holds in the License Agreement. Thus, Sima and Plaintiff would be considered "equal co-holders in the licensing rights to the Song."

Yet, the fact that Plaintiff is described as having a co-ownership interest in an exclusive license is not dispositive. "Whether an agreement transfers rights that are exclusive or nonexclusive is governed by the substance of what was given to the licensee and not the label that the parties put on the agreement." Althin, 874 F. Supp. at 843. Plaintiff's label also cannot serve as a method to subvert summary judgment.

Earlier in this Order, this Court held that two individuals could be "co-exclusive licensees" based on an analogy to Section 201(a) and the doctrine of copyright co-ownership. As previously stated, copyright co-owners are "tenants in common, with each coowner having an independent right to use or license the use of a work." House Report No. 94-1476 (1976). In order to be considered a co-owner of an exclusive license, Plaintiff must in some manner be similarly situated with respect to Sima, meaning that he has an independent and equivalent power to exercise his rights in the License Agreement. Unless this burden is satisfied, this Court must hold that Plaintiff has in effect been assigned the right to file this lawsuit - which has been barred by the Silvers Court.

The Court agrees that Defendants have the better of the argument. First, Plaintiff is prohibited from exercising any decisionmaking authority over almost every portion of the License Agreement. In Paragraph 2, Plaintiff agrees that he cannot exploit Khosara, Khosara, absent Sima's express approval. There is merely one exception to this rule. Plaintiff can negotiate "standard industry agreements" on his own accord, of which there is only one specified example in the Assignment Agreement - mechanical license agreements. However, it is crucial to recognize that Plaintiff could be stripped of even this right if he had failed to file this lawsuit against the Defendants. Under Paragraph 10, Plaintiff's failure to file a lawsuit "relating to the song 'Big Pimpin'' within 180 days from the date" of the Assignment Agreement's signing would have given Sima the option of canceling it in its entirety.

Second, the Assignment Agreement does not confer upon Plaintiff <u>any</u> discretion to file a lawsuit for the alleged infringement of the exclusive license. Paragraph 10 required Plaintiff to file this lawsuit in order to avoid the Assignment Agreement's termination. This condition was undoubtedly inserted at Sima's insistence - if Plaintiff failed to file a lawsuit, Sima would have the option of finding someone else to do so for him. Additionally, Paragraph 5 states that no lawsuit other than the one against Big Pimpin' may be filed without Sima's advance approval. <u>The Assignment Agreement leaves Plaintiff utterly impotent to decide how and when to enforce the License Agreement against infringers</u>. It strains credulity to assert that Plaintiff has anything akin to a co-ownership right in an exclusive license, especially when compared to the independent rights enjoyed by each joint owner of a copyright under Section 201(a).

Neither the parties, nor the Court, have been able to identify much in the way of analogous authority. In the final analysis, the Court finds the Althin district court opinion, cited by Defendants, to be persuasive. In Althin, the Albert Einstein College of Medicine conferred upon Archon Data Systems, Inc. an "exclusive" license in a certain computer software program. 874 F. Supp. at 838. Although the original license was purportedly exclusive, the agreement stated that "Licensor shall have the sole right to determine whether or not any action shall be taken on or against any such infringements and Licensee shall not institute any suit or take any action on account of such infringements without first obtaining Licensor's written consent." Id. at 839. A sublicense was then issued by Archon to the plaintiff. The Althin Court ultimately held that the plaintiff had no standing to sue, largely as a consequence of Albert Einstein's continued ability to decide whether or when the licensee (or sub-licensee) would be able to bring an infringement suit. See id. at 843. As in Althin, the Plaintiff in the instant lawsuit cannot file any action on behalf of Khosara, Khosara without Sima's authorization. This condition is wholly inconsistent with one who holds an interest in an exclusive licensee. An exclusive licensee has the right to bring a lawsuit for infringement (although the 1909 Act requires the joinder of certain parties), but Plaintiff cannot do so unless Sima gives him the required authorization. Essentially, Plaintiff is no more than the individual designated by Sima to enforce the License Agreement at Sima's whim.

The Althin Court was also swayed by the fact that the licensor retained other "substantial rights." For example, the licensee could not transfer its license outside of a very narrow exception. Id.

Similarly, Sima retained the "absolute" right to terminate Plaintiff's "interest" if no lawsuit had been filed against Big Pimpin' in 180 days, and Sima must approve every effort to exploit Khosara, Khosara with the exception of mechanical license agreements.

Additionally, this Court cannot agree that the right to negotiate mechanical licenses provided Plaintiff with any power over an exclusive right. "A mechanical license allows the licensee to use a song in the manufacture and sale of phonorecords." Fred Ahlert Music Corp. v. Warner/Chappell Music, Inc., 155 F.3d 17, 19 n.1 (2d Cir. 1998). "The mechanical license . . . grants third parties the non-exclusive right to reproduce a musical composition on phonorecords, provided that the copyright owner has already authorized the use of such work on phonorecords." 6 Nimmer & Nimmer, supra, § 30.02[F][2]. Under Section 1(e) of the 1909 Act and 115 of the 1976 Act, mechanical licenses are compulsory and must be given to those who meet the requirements of that section. See 2 Nimmer & Nimmer, supra, § 8.04. "In fact, the copyright owner does not 'grant' a [mechanical] license; rather, by statutory compulsion, a license is conferred upon the manufacturer who complies with the strictures enumerated . . . ." Id. at n.3. "Under such provisions, the exclusivity of the copyright owner is in a sense lost." Id. § 1.07. To this Court's knowledge, there is only one exception to this rule: "[n]o compulsory license is available for the first recording of a musical composition on phonorecords. . . . ." 6 Nimmer & Nimmer, supra, § 30.02[F][2] (emphasis added). However, Plaintiff has not adduced any evidence (in order to create an issue of fact) tending to show whether or not Khosara, Khosara has been previously recorded on phonorecords and distributed in the United States. Outside of rank speculation, no

factfinder could conclude that Plaintiff has the power to control the exploitation of any actual exclusive right in Khosara, Khosara.

The Court therefore concludes that Plaintiff is not a co-exclusive licensee due to the fact that: (1) he has no discretion to decide when an alleged infringer should be sued; (2) the Assignment Agreement, and Plaintiff's "interest" in Khosara, Khosara, would have been terminable if a lawsuit had not been filed within 180 days; (3) nearly every effort by Plaintiff to exploit Khosara, Khosara must be approved in advance by Sima; and (4) he has not offered facts that would permit the inference that he has anything beyond the right to negotiate compulsory mechanical licenses, which does not confer Plaintiff with the power to exploit any exclusive rights.

Plaintiff has no standing because he is at best a glorified non-exclusive licensee to whom Sima may from time to time assign a cause of action. Plaintiff's argument that his agreements with Sima only represent irrelevant internal arrangements between co-exclusive licensees with regard to Khosara, Khosraa, (Pl. Opp. at 11-12.), is unpersuasive and ignores reality. In a sense, Plaintiff has even less in the way of substantive rights than the <u>Silvers</u> plaintiff, since the latter was not under any known contractual compulsion, or required any permission, to file a lawsuit. The Court is not required to accept the formalistic labels attached by Plaintiff, Sima, and the Hamdy heirs to their agreement, which would permit them to massage the underlying effect of their contractual relationship. Plaintiff's right to negotiate mechanical licenses does not give him any control over an exclusive right, and Plaintiff's "interest" in the License

Agreement[13] is in substance an effort to compensate him for acting as Sima's agent in this Court.

## IV. CONCLUSION

For the foregoing reasons, this Court GRANTS Defendants' motion for summary judgment on Plaintiff's chain of title and standing. Furthermore, the Court notes that even if Plaintiff were deemed a "co-exclusive licensee," the 1909 Act would require him to join Sima and the Hamdy heirs in this action through the filing of a first amended complaint.[14] Defendants are ORDERED to submit a proposed judgment within ten (10) days.

IT IS SO ORDERED.

DATED: August 3, 2007

STEPHEN V. WILSON
UNITED STATES DISTRICT JUDGE

---

[13] In reaching this conclusion, the Court has relied solely on the undisputed contractual language contained in the agreements between the parties, especially the Joint Venture Agreement and the Assignment Agreement. No factual disputes were resolved against Plaintiff. See Atel Fin. Corp. v. Quaker Coal Co., 321 F.3d 924, 925-26 (9th Cir. 2003) ("Under California law, the interpretation of contract language is a question of law.").

[14] See Followay Prods., Inc. v. Maurer, 603 F.2d 72, 74-75 (9th Cir. 1979) (discussing when a party may be involuntarily joined by a plaintiff under the 1909 Act).